IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

AL GENE PERRY                                                                        PLAINTIFF

v.              Civil No. 5:17-cv-05185

SHERIFF TIM HELDER;                                             DEFENDANTS
DR. ROBERT KARAS; and
NURSE VERONICA DOCKERY

**OPINION**

       Plaintiff, Al Gene Perry, filed this action pursuant to 42 U.S.C. §1983. He proceeds *pro se* and *in forma pauperis*.

       This case arises out of Plaintiff's incarceration in the Washington County Detention Center (WCDC). Plaintiff names as Defendants Sheriff Tim Helder, Dr. Robert Karas, and Nurse Veronica Dockery. Plaintiff sues the Defendants in their individual and official capacities, asserting that his constitutional rights were violated when he was denied adequate medical care. Specifically, he contends that he was not given a medication, Gleevec, prescribed to him by his oncologist, and that he was not given any treatment for a painful hernia. Further, Plaintiff alleges Defendants had a custom or policy of denying medical treatment to inmates until such a time as the Arkansas Department of Correction (ADC) would pay for the treatment.

       The case is before the Court on the Motion for Summary Judgment (ECF No. 30) filed by the Defendants. Plaintiff has responded (ECF No. 36) to the Motion. The Motion is now ready for decision.

I.     BACKGROUND

For non-emergency medical care, WCDC inmates make medical complaints/requests via an electronic kiosk. (ECF No. 32-5 at 3 & 10).[1] The medical requests are reviewed daily by medical personnel. (ECF No. 32-1 at 2). "Nursing staff is responsible for checking the files of inmates under the medical provider's care and following all physician's orders that are noted in those files." (*Id*); *see also* (ECF No. 32-5 at 3). Any appointments with outside medical care providers are made by nursing staff. (ECF No. 32-1 at 2). "Since January 1, 2016, Dr. Rob Karas has been the Jail Medical Doctor and Karas Correctional Health has provided all medical care in the [WCDC] pursuant to a contract with Washington County." (*Id*. at 2-3).

Non-medical personnel are not permitted to make medical decisions except in emergency situations. (ECF No. 32-1 at 3). "All decisions regarding medications, medical testing, or medical treatment are left to the professional medical judgment of the physician at the detention facility." (*Id*)(emphasis omitted). Dr. Karas is not required to "consult with any employee of the [WCDC] before prescribing any medication, testing, or treatment." (*Id*); *see also* (ECF No. 40-1 at 2).

Plaintiff was extradited from Texas after being held there for approximately twenty days and booked into the WCDC on July 29, 2017. (ECF No. 32-6 at 38 & 42);(ECF No. 32-2 at 1-2). He had no medications with him. (ECF No. 32-2 at 1-2). On July 31st, Plaintiff waived a parole revocation hearing and acknowledged that he would be placed in the custody of the ADC. (*Id*. at 3).

---

[1] All record citations are to the CM/ECF document and page number.

On August 1, 2017, Plaintiff submitted his first medical request asserting that he needed his medications, Gleevec[2] and Lisinopril.[3] (ECF No. 32-3 at 1). He stated they could call Dr. Sarah Waley. (*Id*). Nurse Southern responded that same day, stating that they had received his medications from his family. (*Id*). Further, Nurse Southern stated that the provider had reviewed the medications but declined to prescribe them for Plaintiff. (*Id*).

On August 2, 2017, medical staff faxed a request for Plaintiff's records to Highlands Oncology Group (ECF No. 32-4 at 1). That same day, Plaintiff was seen by Nurse Dockery. (ECF No. 32-4 at 35). Plaintiff reported having regularly taken his Gleevec. (*Id*). Nurse Dockery noted the presence of a "[v]ertical healed surgical incision on the anterior abdomen. Mild to moderate herniation of superior scar, easily reducible with no erythema or increased warmth." (*Id*). Nurse Dockery reported that she discussed the signs and symptoms of an incarcerated hernia[4] with the Plaintiff and told him to notify medical if they occurred. (*Id*).

Plaintiff testified that he had seen Dr. Brander at Highlands Oncology about the hernia prior to his incarceration. (ECF No. 32-6 at 50). She told Plaintiff it would be best not to have surgery for the hernia unless it ruptured because of the medication he was taking. (*Id*). Plaintiff was told to just keep a close eye on it. (*Id*).

On August 3, 2017, Highlands Oncology provided the WCDC with the Plaintiff's records. (*Id*. at 3). The records indicate that Plaintiff had a gastrointestinal stromal tumor (GIST) removed on September 26, 2016. (ECF No. 32-4 at 5). There was some evidence of rupture prior to surgery which "place[d] the tumor at higher risk for recurrence." (*Id*). For this reason,

---

[2] Gleevec is the brand name for the drug imatinib and is used to treat certain types of cancer. https://medlineplus.gov/druginfo/meds/a606018.html#brand-name-1 (accessed August 15, 2018).
[3] Plaintiff was given Lisinopril to treat his high blood pressure for a period of time. However, it was discontinued because his blood pressure was within "acceptable" limits. (ECF No. 32-6 at 19-20). Plaintiff makes no argument that this medication was wrongfully withheld from him.
[4] An incarcerated hernia is an irreducible hernia. https://www.medilexicon.com/dictionary/40546 (accessed August 15, 2018).

it was recommended that Plaintiff be started on Gleevec once his abdominal wound was healed. (*Id*). Plaintiff started on Gleevec on November 28, 2016. (*Id.* at 9).

On August 8, 2017, an appointment was made for Plaintiff to be seen at Highlands Oncology on August 18th. (ECF No. 32-4 at 35). Labs and a fasting CT were to be done that morning prior to the appointment. (*Id*). Plaintiff was seen on that date. (ECF No. 32-6 at 33); (ECF No. 32-6 at 53).

At the time, Plaintiff testified he was in pain because of the hernia and Dr. Brander said she would discuss it with Dr. Petrino, Plaintiff's surgeon. (ECF No. 32-6 at 54). Plaintiff felt like he needed the surgery at this point because the hernia had become painful. (*Id*). Plaintiff told Dr. Brander he was not being provided with Gleevec at the WCDC and she put him back on the medication. (*Id*).

Plaintiff testified that at some point when he was seen by Nurse Dockery, she was asking him about his insurance. (ECF No. 32-6 at 55). She told Plaintiff that his Medicaid had automatically stopped because he was in jail. (*Id*). She asked if he had any other insurance coverage. (*Id*). She mentioned that Gleevec was very expensive. (*Id*). Plaintiff testified he told her that they should contact the ADC to see if they would pay for it. (*Id*).

On August 21, 2017, Plaintiff submitted a medical request regarding his "medical condition[s] and [his] medication." (ECF No. 32-3 at 2). He stated he desperately needed surgery for a "hernia about 8in protruding out of my [abdominal] area and it's the size of a softball." (*Id*). He believed that if "it ruptured it could be fatal." (*Id*). Next, he stated he needed his Gleevec that had been approved by his physician at Highlands Oncology almost a week ago. (*Id*). Plaintiff asserted that if he was denied medical attention "any further," he would be filing a § 1983 action. (*Id*). The request was placed "on review." (*Id*).

On August 24, 2017, Plaintiff submitted a grievance about not getting his medication. (ECF No. 32-3 at 4). He asked for a § 1983 form because of this refusal. (*Id*). Corporal Mulvaney responded by noting that his complaint concerned a medical issue and that the "WCDC has nothing to do with the medical staff and them making medical decisions . . . . Therefore it is not WCDC that is not giving you your meds you are requesting." (*Id*). Corporal Mulvaney also provided the Plaintiff with the address of the Court Clerk. (*Id*). That same day, medical staff submitted another request to Highlands Oncology for Plaintiff's medical records from the August 18th visit. (ECF No. 32-4 at 30).

On August 26, 2017, Plaintiff submitted another grievance about his medication. (ECF No. 32-3 at 5). He indicated he had been denied the medication by Dr. Karas, then his oncologist ordered him to continue on Gleevec, and still he was not receiving the medication. (*Id*). According to Plaintiff, he was told that Nurse Dockery was in the process of obtaining his records but when his family attempted to provide a "doctor release form" it was refused. (*Id*). Plaintiff stated that if the current provider could not meet his medical needs, the WCDC should perhaps find a provider that would. (*Id*). The grievance was reassigned to medical services that day. (*Id*).

On August 28, 2017, Plaintiff submitted a medical request asking whether it was possible for Highlands Oncology to fax the medical records to the WCDC. (ECF No. 32-3 at 6). He indicated that he would sign the necessary form. (*Id*). He asserted that he had been approved for the medication by the oncologist. In response, he was told "management is working on your case. [T]hey are getting records[.]" (*Id*).

On August 29, 2017, Plaintiff submitted a grievance about not receiving his Gleevec. (ECF No. 32-3 at 7). The grievance was reassigned to medical on August 30th. (*Id*). C. Dominguez responded as follows:

> according to the pharmacy you gave us (Walmart NM on butterfield coach) none of your meds have been filled since [A]pril 19, 2[0]17 which is more than the 30 days that is required for scripts to be filled
>
> I see they took your blood pressure for a couple of days and the provider then ordered you a bp pill to help with your Bp
>
> I see they are getting record for oncology to look at your medical condition. hope this helps you.

(*Id*).

On August 30, 3017, Plaintiff submitted a medical request. (ECF No. 32-3 at 8). He asked if they had heard anything from Highlands Oncology. (*Id*). If not, he asked if medical staff could contact them. (*Id*). In response, Plaintiff was told that medical staff were in the process of obtaining his records. (*Id*).

Plaintiff also submitted a grievance that day. (ECF No. 32-3 at 9). He noted it had been two weeks since his appointment at which the oncologist approved his prescription for Gleevec. (*Id*). Plaintiff asserted that medical staff were taking too long to get his records and get him started on the medication. (*Id*). The grievance was reassigned to medical staff. (*Id*). On August 31, 2017, Plaintiff was told medical staff had obtained his records but they were not signed by the physician. (*Id*). Plaintiff was told the office was being contacted by phone. (*Id*). On September 1st, Plaintiff asked if they had heard back from Highlands Oncology. (*Id*).

On September 1, 2017, Nurse Dockery noted they had received the records from Highlands Oncology regarding Plaintiff's August 18th visit. (ECF No. 32-4 at 36). She noted that Plaintiff

"was to continue on Gleevec, due to high risk of recurrence for GIST tumor." (*Id*). She also wrote that she would send a request for Gleevec through the ADC. (*Id*).

On September 1, 2017, medical staff submitted to the ADC a health services request form for "ADC jail detainees." (ECF No. 32-4 at 33). Plaintiff's medical history regarding the GIST tumor was summarized and approval was sought to restart Gleevec in accordance with the recommendation of oncology. (*Id*). The ADC responded by asking for Plaintiff's medical records including the oncology records. (*Id*). Note was made that Plaintiff's transfer to the ADC would be expedited. (*Id*).

On September 3, 2017, Plaintiff submitted another grievance stating that the medical department had refused to give him Gleevec. (ECF No. 32-3 at 10). Plaintiff stated it was his belief that medical staff refused to provide treatment or medication until they found out if the ADC was going to pay for it. (*Id*). Plaintiff also asserted that they avoided giving him Gleevec because it was expensive. (*Id*). In his opinion, "the Detention Center and medical just refuse to treat detainees because of the expenses causing the medical problems to only worsen over time due to medical neglect." (*Id*). He indicated he had now been told that the medication had been ordered. (*Id*).

On September 6, 2017, medical staff manager K. Hughes made the following response:

> I have told you over and over again that we have no signed records of you being on this medication. we can not fill this prescription until this is done. we have requested records numerous times to be signed. . . . just to be clear-we have not refused to treat you. just can not verify from any medical doctor the medication that you say you take.

(ECF No. 32-3 at 10).

On September 10, 2017, Plaintiff submitted a medical request asking what he needed to do "step by step" to start getting Gleevec. (ECF No. 32-2 at 11). He was told that the ADC had not approved the Gleevec. (*Id*).

On September 13, 2017, a note was made in Plaintiff's medical file that his family was willing to bring the Gleevec to the jail so it could be administered there. (ECF No. 32-4 at 37). The note also indicates that the ADC was not sure how long it would take to fast track the Plaintiff. (*Id*). On September 14th, Dr. Karas wrote that if the family brought in the Gleevec, medical staff would restart it. (*Id*).

Plaintiff submitted a grievance on September 13, 2017, stating he was still not receiving his Gleevec. (ECF No. 32-2 at 12). The grievance was reassigned to medical. (*Id*). The grievance was not responded to until September 18th, when K. Hughes stated that Gleevec had been ordered and should be there on Friday. (*Id*).

On September 14, 2017, Plaintiff submitted a medical request asking how the ADC could refuse to approve his medication when they had not seen him or his medical records. (ECF No. 32-3 at 13). Plaintiff asked that he be provided the proper medication or be transferred to the ADC. (*Id*). On September 14th, M. Howard replied that the ADC had fast tracked Plaintiff for placement due to his medical problems. (*Id.*). Plaintiff was told that "the provider" had authorized the use of Plaintiff's home medication if his family would bring it in. (*Id*).

On September 21, 2017, a prescription was added for Gleevec. (ECF No. 32-4 at 38). The pharmacy was listed as "Family Pay." (*Id*). The start date for dispensing the medication was that day, September 21st. (*Id*). Plaintiff's medication records indicate he began to receive Gleevec that day at the evening medication distribution. (*Id.* at 39). He continued to receive the Gleevec through September 28th when he was transferred to the ADC. (*Id*).

On September 22, 2017, Plaintiff submitted a medical request stating he was taking the Gleevec with a full glass of water. (ECF No. 32-3 at 14). However, he said the directions also indicated it should be taken with a meal. (*Id*). He asked if it was possible to get a sack meal when the p.m. medications were distributed to keep his stomach from getting upset. (*Id*). In response, Plaintiff was told that "[i]t should be okay to take after you get your evening meal. Just not before. We don't give out sack lunches." (*Id*).

On September 26, 2017, Plaintiff submitted a medical request stating that after he took the medicine he got "horrible indigestion and vomit most of the time." (ECF No. 32-3 at 15). He indicated he thought he needed a meal with his medication. (*Id*). He asked for information on the side effects of the medication. (*Id*). M. Howard responded that he would get some information for the Plaintiff and see what medical staff could do about the food. (*Id*).

On September 27, 2017, Plaintiff stated he had been told that taking his meal two hours before he took the medication should be sufficient. (ECF No. 32-3 at 16). However, he said he had vomited again and his stomach was hurting from indigestion. (*Id*). He asked medical to explain that he must have a sandwich or something to counter the acidic reaction he was having to the medication. (*Id*). He said he was suffering from "not having [the] medical insert directions followed." (*Id*). In response, he was told that medical staff would "not do a diet change." (*Id*).

That same day, Plaintiff also submitted a grievance regarding not having a meal with his medication or having his medication brought just after meal time. (ECF No. 32-3 at 17). The grievance was reassigned to medical. (*Id*). K. Hughes responded that "its ok if you save something from your breakfast tray to eat with your medication." (*Id*). Further, Plaintiff was told that the pharmacist said that as long as Plaintiff took the medication with a full glass of

water, he would be fine.  (*Id*).  In response, Plaintiff pointed out that inmates were not allowed to save food.  (*Id*).  He also asked that his medication be brought to him at meal time.  (*Id).*

Plaintiff testified that it took his system about two weeks to become adjusted to taking the Gleevec again.  (ECF No. 32-6 at 58).  During the adjustment period, he had problems with his stomach, vomited, had diarrhea, felt dizzy and tired, and had weird dreams.  (*Id*. at 58-61).

Plaintiff testified at his February 7, 2018, deposition that the hernia was about the same—"it's large."  (ECF No. 32-6 at 63).  He testified it is painful when he lays on his stomach or coughs.  (*Id.* at 78).  He indicated that the doctors at the ADC have not done anything about the hernia.  (*Id*).

By affidavit, Dr. Karas asserts that if an inmate was "noncompliant with medications prior to coming into the [WCDC's] care" the medications would not be automatically restarted.  (ECF No. 40-1 at 3).[5]  Instead, further investigation would need to be done regarding the necessity of the medication.  (*Id*).  Dr. Karas states that he did not feel comfortable restarting Gleevec because it "is a powerful drug with multiple side [e]ffects and only prescribed by [an] Oncologist."  (*Id*).

Dr. Karas states that they immediately ordered Plaintiff's oncology records, reviewed them when received, and scheduled a follow-up oncology visit for the Plaintiff.  (ECF No. 40-1 at 4).  Dr. Karas indicates that the Highlands Oncology records from the August 18, 2017 CT scan showed no recurrence of the cancer.  (ECF No. 40-1 at 4).  Dr. Brander recommended that the Gleevec treatment continue.  (*Id*).  However, while the records from this visit were requested on August 24th, Dr. Karas indicates that they were not received until September 1, 2017.  (*Id*).

According to Dr. Karas, the ADC was required to authorize payment for the medication since Plaintiff was a convicted inmate.  (ECF No. 40-1 at 4).  When the ADC refused to approve

---

[5] Dr. Karas' affidavit submitted as ECF No. 32-7 was missing a page.  Defendants were asked to supplement the affidavit.  The complete affidavit was submitted as ECF No. 40-1.

Gleevec, Dr. Karas states Plaintiff was notified that if the family could provide the medication, they would administer it. (*Id*).

## II.   LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chem. Co*., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.   DISCUSSION

Defendants maintain they are entitled to summary judgment because: (1) there is no proof of any personal involvement on the part of Sheriff Helder; (2) they were not deliberately

indifferent to the medical needs of the Plaintiff; (3) they are entitled to qualified immunity; and (4) there is no basis for official capacity liability.

### (A). Individual Capacity Claim Against Sheriff Helder

A claim of deprivation of a constitutional right cannot be based on a respondeat superior theory of liability. *See Monell v. Department of Soc. Servs.*, 436 U.S. 654, 694 (1978). "[A] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity." *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994*); see also Whitson v. Stone Cty. Jail*, 602 F.3d 920, 928 (8th Cir. 2010) ("In a § 1983 case, an official is only liable for his own misconduct and is not accountable for the misdeeds of his agents under a theory such as respondeat superior or supervisor liability")(internal quotations omitted). To establish personal liability of the supervisory defendant, [Plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (*quoting Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006)); *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993).

Here, Plaintiff has alleged no causal link between the actions of Sheriff Helder and the alleged deprivation of rights. Plaintiff does not allege that Sheriff Helder was involved in any way in making decisions about his medical treatment or that Sheriff Helder was even aware of Plaintiff's requests for medical treatment. There is simply no basis on which to hold Sheriff Helder liable in his individual capacity. Sheriff Helder is entitled to judgment in his favor on the individual capacity claims.

### (B). Individual Capacity Claims Against Dr. Karas and Nurse Dockery

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "A serious medical need is one that has been diagnosed by a

physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)(internal quotation marks and citation omitted).

The deliberate indifference standard includes "both an objective and a subjective component. The objective component requires a plaintiff to demonstrate an objectively serious medical need. The subjective component requires a plaintiff to show the defendant actually knew of, but deliberately disregarded, such need." *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009)(internal quotation marks and citations omitted).

"In order to demonstrate that a defendant actually knew of, but deliberately disregarded, a serious medical need, the plaintiff must establish a 'mental state akin to criminal recklessness: disregarding a known risk to the inmate's health.'" *Id.* (*quoting Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006)). "However, while a deliberate-indifference claim requires establishment of a defendant's actual, subjective knowledge, such knowledge can be demonstrated with circumstantial evidence." *Id.* (*citing Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).

In this case, Plaintiff alleges a delay in medical treatment. "When the inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, the objective seriousness of the deprivation should also be measured by reference to the *effect* of delay in treatment. To establish this effect, the inmate must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005)(internal quotation marks and citations omitted-emphasis in original).

Plaintiff's first claim is based on the delay in the provision of the Gleevec. Although there is undisputed evidence supporting the Plaintiff's need for treatment with Gleevec, he offers no

evidence that the delay in his receipt of the medication while incarcerated at the WCDC adversely impacted his health. In fact, he admits that he has no medical evidence suggesting the delay adversely impacted the likelihood that there would be a reoccurrence of the cancer. (ECF No. 32-6 at 63-65); *see e.g., Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997)(no medical evidence presented showing the "delay . . . had any adverse affect on his prognosis"). Additionally, there was evidence that Plaintiff did not always take the medication as prescribed and evidence he was without the medication for approximately twenty days while incarcerated in Texas. (ECF No. 32-6 at 36-38). In fact, Plaintiff did not submit a medical request asking to be provided the medication while incarcerated in Texas and did not ask his family to provide his medication. (*Id.* at 39). Plaintiff has therefore failed to raise a genuine issue of material fact as to an essential element of this Eighth Amendment claim.

Plaintiff's second claim is that he was denied surgery for his hernia. Plaintiff was seen by Nurse Dockery and she explained to Plaintiff that there was no need to have surgery performed unless the hernia became incarcerated. Plaintiff testified that Dr. Brander had previously advised Plaintiff that surgery was not advisable while Plaintiff was on Gleevec unless the hernia ruptured. (ECF No. 32-6 at 51). Plaintiff has presented no evidence to the contrary other than his testimony that Dr. Brander had agreed to speak with Plaintiff's surgeon about the hernia. (*Id.* at 54). Dr. Brander had not changed her opinion on the need for surgery. (*Id*). Plaintiff has not had surgery on the hernia. He testified that the hernia is "about the same, I guess. It's just large." (*Id.* at 63). The ADC is doing nothing to treat the hernia. Plaintiff has failed to present any verifying medical evidence that the denial of surgery while he was incarcerated at the WCDC had any adverse affect on his health or caused the hernia to worsen. He has failed to raise a genuine issue of material fact as to an essential element of his Eighth Amendment claim.

The medical Defendants are entitled to summary judgment on Plaintiff's claim against them in their individual capacity.

### (C). Qualified Immunity

Analyzing a claim of qualified immunity requires a two-step inquiry. *Jones v. McNeese,* 675 F.3d 1158, 1161 (8th Cir. 2012). "An official is entitled to qualified immunity unless (1) the evidence, viewed in the light most favorable to the nonmoving party, establishes a violation of a federal constitutional or statutory right, and (2) the right was clearly established at the time of the violation." *Robinson v. Payton,* 791 F.3d 824, 828 (8th Cir. 2015). "Unless the answer to both these questions is yes, the defendants are entitled to qualified immunity." *Krout v. Goemmer,* 583 F.3d 557, 564 (8th Cir. 2009). Having concluded the facts do not make out a constitutional violation, the medical Defendants are entitled to qualified immunity. *See e.g., Groenewold v. Kelly*, 888 F.3d 365, 371 (8th Cir. 2018)("If we conclude the alleged facts do not violate a constitutional right, . . . the defendant will be entitled to qualified immunity").

### (D). Official Capacity Liability

Here, Plaintiff has alleged that Washington County has a policy of delaying the provision of any expensive treatment until the ADC agrees to pay for the treatment. For governmental liability to attach, an "official policy or custom must, of course, be the 'moving force of the constitutional violation.'" *Thomsen v. Ross*, 368 F. Supp. 2d 961, 969 (D. Minn. 2005)(*citing Monell*, 436 U.S. at 694). Whether or not the policy described by Plaintiff could be found unconstitutional under different circumstances, Plaintiff's claim fails here because, as explained above, he suffered no constitutional deprivation. *Cooper v. Martin*, 634 F.3d 477, 481-82 (8th Cir. 2011)("In order for municipal liability to attach, individual liability must first be found on an underlying substantive claim")(internal quotation marks and citation omitted).

## IV. CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment (ECF No. 30) is **GRANTED.** A judgment in accordance with this opinion will be entered.

IT IS SO ORDERED on this 27th day of August 2018.

*/s/ P.K. Holmes, III*
P. K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE